UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| HEALTHPOINT, LTD., d/b/a | § | |
| HEALTHPOINT | § | |
| BIOTHERAPEUTICS, | § | Cv. No. SA:12-CV-01062-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| DERMA SCIENCES, INC., | § | |
| | § | |
| Defendant. | § | |

ORDER DENYING DEFENDANT'S MOTION TO TRANSFER VENUE

On April 5, 2013, the Court heard oral argument on the Motion to

Transfer Venue to the District of New Jersey filed by Defendant Derma Sciences,

Inc. ("Derma Sciences").  (Doc. # 15 ("Mot.").)  Saul Perloff, Esq., Katharyn A.

Grant, Esq., and Bob Rouder, Esq., appeared on behalf of Plaintiff Healthpoint

Ltd., d/b/a Healthpoint Biotherapeutics ("Healthpoint").  Winn Carter, Esq.,

appeared on behalf of Derma Sciences.  After considering the Motion and the

supporting and opposing memoranda, and in light of the parties' arguments at the

hearing, the Court, for the reasons below, **DENIES** Defendant's Motion.

BACKGROUND

This is a false advertising and unfair competition lawsuit.  Plaintiff

Healthpoint is a Texas limited partnership headquartered in Fort Worth, Texas.

(Doc. # 1 ("Compl.") ¶ 1; doc. # 17 ("Resp.") at 6.)  Healthpoint markets a range of pharmaceuticals, biologics, and medical products for the prevention and treatment of diseased and traumatized skin and tissue.  (Compl. ¶ 1.)  Among the products that Healthpoint markets is Collagenase SANTYL® ointment ("SANTYL"), an FDA-approved, sterile enzymatic ointment used to help remove dead tissue and foreign material from wounds in order to promote healthy tissue formation and wound closure (a process known as "debridement").  (Id. ¶¶ 1, 12.) According to Healthpoint, SANTYL is the only FDA-approved prescription enzymatic (i.e., chemical) debriding product available in the United States. (Id. ¶ 12.)  Annual sales of SANTYL exceed $140 million.  (Id. ¶ 14.)

Defendant Derma Sciences is a corporation organized under the laws of Delaware; its principal place of business is Princeton, New Jersey.  (Mot. at 1.) Derma Sciences markets a line of wound and burn dressings known as MEDIHONEY® ("MEDIHONEY") nationwide.  (Compl. ¶ 15; doc. # 10 ("Answer") ¶ 1.)  MEDIHONEY is available in several formats, including adhesive and non-adhesive hydrogel sheet dressings, and is promoted as containing "active" *Leptospermum* honey.  (Compl. ¶ 15; Answer ¶ 15.)  Healthpoint alleges that *Leptospermum* honey is also known as "Manuka Honey" and is produced by bees that feed off the manuka plant (*Leptospermum scoparium*) in New Zealand. (Compl. ¶ 15 n.1.)  Internet advertising touts manuka honey as having

2

"unsurpassed healing qualities" for a wide range of conditions, including stomach ulcers, sore throats and colds, skin ulcers, wounds, boils, and infections.  (Id. (citing http://manukahoney.com).)  However, according to Healthpoint, the FDA has never approved a drug containing manuka honey for any purpose.  (Id.) Instead, the FDA recently issued an import alert allowing FDA field personnel to detain shipments of certain products from New Zealand that contain manuka honey.  (Compl. Ex. 1.)

        MEDIHONEY's labeling lists no active ingredient or enzyme content. (Compl. ¶ 16; Answer ¶ 16.)  According to the Complaint, MEDIHONEY dressings are "unclassified" medical devices subject only to the premarket notification requirements of Section 510(k) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360(k).  (Compl. ¶ 3; see also Mot. ¶ 3 (stating that MEDIHONEY products have been evaluated by the FDA "as devices subject to the regulatory requirements of Section 510(k)" and have been "cleared by the FDA for assisting in wound healing and debridement").)  Moreover, Healthpoint alleges that MEDIHONEY was cleared for sale in the United States based on a determination that the products are substantially equivalent to legally marketed predicate devices marketed prior to May 28, 1976, that provide moisture to a wound.  (Id.)  Healthpoint claims that MEDIHONEY "does not debride

wounds" and that the FDA has not approved MEDIHONEY as either a drug or a medical device.  (Id.)

On November 7, 2012, Healthpoint brought suit against Derma Sciences in this Court for false advertising and unfair competition in violation of Section 43(a) of the Lanham Act and for common-law unfair competition.  (See Compl.)  The crux of Healthpoint's allegations is that Derma Sciences, "[i]n its commercial advertising and promotion of MEDIHONEY, including on its web site, in print publications, in brochures distributed by its sales staff, and in oral presentations . . . makes misrepresentations of fact concerning the nature, characteristics and qualities of MEDIHONEY, both alone and in comparison, connection or association with SANTYL."  (Id. ¶ 18.)  Specifically, Healthpoint alleges that Derma Sciences makes the following material misrepresentations: (1) that the honey used in MEDIHONEY is "active" in healing wounds (id. ¶ 18(a)–(b)); (2) that MEDIHONEY debrides wounds and is clinically proven (id. ¶ 18(c)–(f)); (3) that MEDIHONEY provides anti-inflammatory/antimicrobial activity (id. ¶ 18(g)–(h)); that MEDIHONEY creates an osmotic effect and lowers wound pH (id. ¶ 18(i)–(j)); and (4) that MEDIHONEY is an equally or more effective alternative to SANTYL (id. ¶ 18(k)).

Healthpoint alleges that these misrepresentations are material because they "are likely to affect, and in fact, do affect the decision by acute care centers,

4

extended care facilities, wound and burn care clinics, hospitals, nursing homes, home health agencies, group purchasing organizations, managed care organizations and/or others to purchase and use MEDIHONEY as an alternative to SANTYL." (Id. ¶ 26.)  By convincing potential customers to purchase MEDIHONEY instead of SANTYL, Derma Sciences' misrepresentations have harmed Healthpoint. (Id. ¶¶ 27–28.)  Moreover, claims Healthpoint, Derma Sciences knows that its promotional claims are false and misleading, because it promised, inter alia, in response to a cease-and-desist letter from Healthpoint, "not to represent that 'MEDIHONEY is as effective as enzymatic debridement' or words to that effect"; and "not to represent that 'MEDIHONEY is more cost effective than SANTYL,' or words to that effect."  (Id. ¶ 29.)

On January 3, 2013, Derma Sciences filed its Answer.  (Doc. # 10 ("Answer").)  On January 11, 2013, Derma Sciences filed the Motion to Change Venue to the District of New Jersey that is now before the Court.  (Doc. # 15 ("Mot.").)  Healthpoint filed a Response in Opposition to the Motion on January 31, 2013.  (Doc. # 17 ("Resp.").)  Derma Sciences filed its Reply in Support of the Motion on February 11, 2013.  (Doc. # 21 ("Reply").)

<u>STANDARD OF REVIEW</u>

Pursuant to 28 U.S.C. § 1404(a), a district court may, for the convenience of parties and witnesses, transfer any civil action to any other district

or division where it might have been brought or to any district or division to which all parties have consented.  28 U.S.C. § 1404(a).  "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)).  The party moving for transfer carries the burden of showing good cause.  See Humble Oil & Ref. Co. v. Bell Marine Serv., Inc., 321 F.2d 53, 56 (5th Cir. 1963); see also In re Volkswagen of Am., Inc., 545 F.3d 304, 314 (5th Cir. 2008) [hereinafter "Volkswagen II"] ("When viewed in the context of § 1404(a), to show good cause means that a moving party, in order to support its claim for a transfer, must . . . clearly demonstrate that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'") (quoting 28 U.S.C. § 1404(a)).

     "The preliminary question under § 1404(a) is whether a civil action 'might have been brought' in the destination venue."  Volkswagen II, 545 F.3d at 312.  If this requirement is met, the Fifth Circuit Court of Appeals has held that "[t]he determination of 'convenience' turns on a number of public and private interest factors, none of which can be said to be of dispositive weight."  Action Indus., Inc. v. U.S. Fid. & Guar. Co., 358 F.3d 337, 340 (5th Cir. 2004).  The private factors include: "(1) the relative ease of access to sources of proof; (2) the

availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." In re Volkswagen AG, 371 F.3d 201, 203 (5th Cir. 2004) [hereinafter "Volkswagen I"] (citing to Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241 n.6 (1982)).  The public factors include: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws of the application of foreign law." Id.

A plaintiff's choice of venue is not an independent factor in the venue transfer analysis, and courts must not give inordinate weight to a plaintiff's choice of venue.  Volkswagen II, 545 F.3d at 314 n.10, 315 ("[W]hile a plaintiff has the privilege of filing his claims in any judicial division appropriate under the general venue statute, § 1404(a) tempers the effects of the exercise of this privilege.").  However, "when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." Id. at 315.

DISCUSSION

I.   The Movant's Burden

Derma Sciences moves for this case to be transferred to the District of New Jersey pursuant to § 1404(a), arguing that that district "is the center of gravity for this case, where it would be far more convenient for the parties and the witnesses to litigate . . . ."  (Mot. at 1.)  Both parties agree that "a civil action 'might have been brought,'" Volkswagen II, 545 F.3d at 312, in the District of New Jersey.  (Mot. at 5–6; Resp. at 4.)  Derma Sciences acknowledges that "the only remaining question is whether New Jersey is a 'clearly more convenient' venue for this case."  (Reply at 3.)  However, pointing to the Supreme Court's decision in Sinochem International Co. v. Malaysia International Shipping Co., 549 U.S. 422 (2007), Derma Sciences insists that the "baseline level of convenience that must be overcome" in order to justify transfer is lowered where, as here, a plaintiff has not brought suit in its home venue.  (Reply at 3–4.)

Sinochem involved "a textbook case for immediate forum non conveniens dismissal": a Malaysian company had brought suit against a Chinese company in the Eastern District of Pennsylvania.  549 U.S. at 435.  The complaint was based "misrepresentations to the Guangzhou Admiralty Court in the course of securing arrest of [a] vessel in China," and the Supreme Court found that this was "an issue best left for determination by the Chinese courts."  Id. at 435.  Citing its

decision in Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981), in which a wrongful death suit arising from a plane crash in Scotland had been brought in the United States "because [U.S.] laws regarding liability, capacity to sue, and damages [were] more favorable," id. at 240, the Court explained that "[w]hen the plaintiff's choice is not its home forum, . . . the presumption in the plaintiff's favor 'applies with less force,' for the assumption that the chosen forum is appropriate is in such cases 'less reasonable.'" Sinochem, 549 U.S. at 430 (quoting Piper Aircraft Co., 454 U.S. at 255–256)).  The Court reads these cases as holding that the presumption in favor of a plaintiff's chosen forum is only as strong as the plaintiff's connections to that forum are.

While it is true that Healthpoint is headquartered in Fort Worth, which is located in the Northern District of Texas, this case does not present the kind of blatant forum shopping that would eliminate any presumption in favor of the plaintiff's chosen forum.  At the time the case was filed, Healthpoint was a subsidiary of DFB Pharmaceuticals, an integrated specialty pharmaceutical company based in San Antonio.[1]  (Resp. at 6.)  DPT Laboratories, which manufactures and distributes SANTYL, was and is located in San Antonio. (Resp. at 9.)  Since the year 2000, Healthpoint has litigated five false advertising cases

---

[1] The Complaint in this case was filed on November 7, 2012.  (See doc. # 1.)  On December 27, 2012, Healthpoint's assets were acquired by Smith & Nephew, PLC, a global medical technology business.  (See Resp. at 6.)

involving pharmaceutical products in the Western District of Texas.  (Resp. at 16.)
Moreover, as explained in more detail below, Healthpoint brought this case after
learning of four instances in which agents of Derma Sciences allegedly made
material misrepresentations to healthcare providers regarding SANTYL and
MEDIHONEY, all of which took place in the Western District.  (Resp. at 8.)  Even
though Healthpoint's corporate headquarters are in Fort Worth, therefore, it is clear
that it does have connections to the Western District of Texas that make this
district a logical one in which to bring suit.  Cf. In re Zimmer Holdings, Inc., 609
F.3d 1378, 1381 (Fed. Cir. 2010) (finding that the case before it was "a classic case
where the plaintiff," a Michigan company, was "attempting to game the system by
artificially seeking to establish venue by sharing [Texas] office space with another
of the trial counsel's clients"); In re Hoffman-La Roche Inc., 587 F.3d 1333, 1337
(Fed. Cir. 2009) ("[T]he assertion that these documents are 'Texas' documents is a
fiction which appears to be have been created to manipulate the propriety of
venue.").  Accordingly, while the Court will factor into its analysis the fact that this
is not Healthpoint's home venue, that fact will not serve to eliminate entirely the
presumption in favor of a plaintiff's chosen forum.  See Koster v. Lumbermens
Mut. Cas. Co., 330 U.S. 518, 527–28 (1947) (noting that the doctrine of forum non
conveniens "resists formalization and looks to the realities that make for doing
justice").  Derma Sciences must still demonstrate that the District of New Jersey is

a "clearly more convenient" venue than the Western District of Texas, <u>Volkswagen</u> <u>II</u>, 545 F.3d at 315; and, as explained in more detail below, the Court concludes that an analysis of the public- and private-interest factors described in <u>Volkswagen</u> <u>I</u> and <u>Volkswagen II</u> militates against transfer.

II.   <u>Private Factors</u>

A.  <u>Relative Ease of Access to Sources of Proof</u>

The first <u>Volkswagen I</u> factor requires a court to determine which of the two forums provides easier access to relevant sources of proof.  <u>Volkswagen I</u>, 371 F.3d at 203.  "[T]his factor almost invariably turns on which party will most likely have the greater volume of relevant documents and their presumed physical location in relation to the venues under consideration."  <u>Remmers v. United States</u>, Cv. No. 1:09–CV–345, 2009 WL 3617597, at *4 (E.D. Tex. Oct. 28, 2009) (citing <u>Fujitsu Ltd. v. Tellabs, Inc.</u>, 639 F. Supp. 2d 761, 767 (E.D. Tex. 2009)).

Derma Sciences argues that the sources of proof are primarily in New Jersey.  "What is <u>relevant</u>," insists Derma Sciences, "is how Derma Sciences sold its MEDIHONEY product, the statements made in its national marketing efforts, and whether those statements are permitted under MEDIHONEY's FDA regulatory authorization for commercial distribution."  (Reply at 2.)  Accordingly, argues Derma Sciences, most of the relevant evidence is in New Jersey:

> All day-to-day business decisions regarding Derma Sciences, including the decisions regarding marketing and clinical evaluation, take place in the

11

district of New Jersey.  The relevant documents regarding copies of FDA
regulatory documents; materials relating to the preparation, development,
and distribution of sales and marketing materials for MEDIHONEY and
Derma Sciences' website; clinical evaluations of MEDIHONEY; and sales
information relating to MEDIHONEY are located in the District of New
Jersey.

(Mot. at 7 (citations omitted).)  Derma Sciences argues that Healthpoint, by

contrast, "has not indicated that it has <u>any</u> relevant documents in this District or

anywhere else for that matter."  (Reply at 5.)

Healthpoint insists that Derma Science's emphasis on documents is

misplaced because the location of documents "'assumes much less importance in

the era of electronic documents,' especially where the parties' 'sources of proof are

easily accessible electronically."  (Resp. at 12 (quoting <u>JP Morgan Chase Bank, N.</u>

<u>Am. v. Dixon</u>, Cv. No. 3:11-CV-00157, 2011 WL 2534601, at *3 (N.D. Tex. June

24, 2011)).)  To the extent that the location of documents is relevant, however,

Healthpoint argues that Derma Sciences has not shown how transferring this case

to its home district would reduce the burden for either party in terms of identifying

those documents; in collecting, reviewing, and preparing the documents for

production; or in actually producing them.  (Resp. at 13.)  First, Healthpoint notes

that Derma Sciences does not manufacture MEDIHONEY in New Jersey.  Instead,

MEDIHONEY is apparently manufactured overseas by a company called Comvita

USA, whose corporate offices are in New Zealand and whose U.S. representatives

are in Arizona.  (Resp. at 11.)  At the hearing, Healthpoint's counsel asserted, and

Derma Sciences' counsel did not contest, that Derma Sciences merely has the

exclusive license to distribute MEDIHONEY in the United States.  Additionally,

"all of the 'studies' regarding MEDIHONEY Derma Sciences identifies on its

website were performed by third parties outside of New Jersey, and indeed, outside

of the U.S."  (Resp. at 11–12.)  Virtually all of these studies were performed in

Ireland, the United Kingdom, Australia, Germany, and Norway.  (Id. at 12 (citing

doc. # 17-2 ("Grant Decl.") Ex. 6).)  Because documents related to the manufacture

of MEDIHONEY and the studies done on it will have to be obtained from abroad,

argues Healthpoint, this factor does not favor New Jersey over Texas.  (Id.)

Just as importantly, Healthpoint argues that it has many relevant

documents in this district.  For example, Healthpoint

> has sponsored numerous clinical trials of the safety and efficacy of
> SANTYL for debriding wounds, including trials that were conducted in San
> Antonio, Texas, and in other parts of the Western District of Texas.  These
> studies include a Comparison of Collagenase Santyl® Ointment Used
> Adjunctively to Sharp Surgical Debridement and Sharp Surgical
> Debridement in the Care of Diabetic Foot Wounds (NCT01408277),
> conducted in part by Robert Wunderlich, DPM and Endeavor Clinical Trials
> in San Antonio, Texas; and a Comparison of Sharp Surgical Debridement
> Versus Collagenase Santyl Ointment in the Care of Diabetic Foot Wounds
> (NCT01056198), conducted in part by Robert Wunderlich, DPM in San
> Antonio, Texas[,] and Providence Health Center in Waco, Texas.

(Resp. at 9 (quoting doc. # 17-1 ("Girolamo Decl.") ¶ 7).)  Because there are

important documents in both venues, argues Healthpoint, this factor is neutral.

13

While Healthpoint is correct that modern technology makes it easier to access certain sources of proof than it was in the past, that alone "does not render this factor superfluous"; it must not be read out of the § 1404(a) analysis. Volkswagen II, 545 F.3d at 316.  Because the crux of Healthpoint's argument is that Derma Sciences has engaged in false advertising and unfair competition, Derma Sciences will undoubtedly be forced to produce voluminous documents regarding its marketing and clinical testing of MEDIHONEY.  Nevertheless, the Court is not convinced that this factor weighs in favor of transfer.

First, to the extent that documents relating to the manufacture of MEDIHONEY and the aforementioned clinical studies are located abroad, the Court agrees with Healthpoint that such documents are as easily accessed in this district as in any other.  In Portal Technology LLC v. Yahoo! Inc., for example, defendant Yahoo moved to transfer the case to Yahoo's home venue in California, arguing that most of its personnel were located in Silicon Valley.  Rejecting this argument, Judge Gilstrap noted that "the vast majority of Yahoo documents and witnesses relevant to this lawsuit are located in Bangalore, India, and . . . the approximate distance and ease of travel from Bangalore to San Francisco, California[,] is essentially the same as from Bangalore to Marshall, Texas."  Cv. No. 2:11-CV-440-JRG, 2012 WL 3242205, at *2 (E.D. Tex. Aug. 7, 2012); see also Frito-Lay N. Am. v. Medallion Foods, Inc., 867 F. Supp. 2d at 869 (E.D. Tex.

14

2012) (concluding that where sources of proof originate in many different locations, this factor is neutral).  Similarly, in this case, if documents relevant to clinical studies on MEDIHONEY are located in Ireland, the United Kingdom, Australia, Germany, and Norway, the difference between shipping those documents to New Jersey and shipping them to Texas is not significant.

Second, as described above, it is likely that Healthpoint will also have to produce documents relating to the clinical trials performed on SANTYL, since the manner in which SANTYL works is relevant to a determination of whether it was a misrepresentation for Derma Sciences to market MEDIHONEY as a lower-cost alternative that works just as well.  Indeed, at the hearing, Healthpoint's counsel indicated that Derma Sciences was seeking to discover information regarding the manufacture of SANTYL and the research that Healthpoint had done on it.  Where, as here, important documents are located in both venues, this factor does not weigh in favor of transfer.  Compare AllChem Performance Prods., Inc. v. Oreq Corp., Cv. No. 3:11-CV-3577-D, 2013 WL 180460, at *3 (N.D. Tex. Jan. 17, 2013) ("[T]he only specified evidence is located at defendants' place of business in Temecula, and thus this factor favors transfer."), with Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc., Cv. No. 3:07-CV-2042-D, 2008 WL 794533, at *3 (N.D. Tex. Mar. 26, 2008) (concluding that factor was neutral because documents were located in both venues), Konami Dig. Ent. Co. Ltd. v. Harmonix Music Sys.,

No. 6:08–CV–286–LED–JEL, 2009 WL 781134, at *4 (E.D. Tex. Mar. 23, 2009) ("While Defendants point to [the transferee district] as the location of significant sources of proof, they ignore the remaining sources of proof which originate from other locations."), and Perritt v. Jenkins, Cv. No. 4:11-CV-23-MHS-ALM, 2011 WL 3511468, at *3 (E.D. Tex. July 18, 2011) ("Because the sources of proof originate from varied locations, this factor is neutral.").

Finally, Derma Sciences has not explained how transferring this case to the District of New Jersey would reduce the burden for either party in terms of producing the necessary documents, which are likely to be exchanged electronically.  See Symbol Tech. v. Metrologic Instruments, 450 F. Supp. 2d 676, 678 (E.D. Tex. 2006) (finding that this factor did not weigh in favor of transfer where the movant did not explain how transfer would make document production less burdensome and where the documents were likely to be exchanged electronically).  Indeed, Plaintiff Healthpoint has already obtained many of the documents and advertising materials it intends to use against Derma Sciences simply by downloading them from Derma Sciences' website.  Accordingly, the Court concludes that this factor is neutral.

B.  <u>Availability of Compulsory Process to Secure the Attendance of</u>

<u>Witnesses</u>

Derma Sciences argues that this prong favors transfer because it has

used third-party vendors, such as advertising agencies and marketing consultants,

to assist in preparing materials for its MEDIHONEY products, and these vendors

are located in eastern Pennsylvania.  (Mot. at 7.)  It also states that many former

Derma Sciences employees are located "near there."  (Reply at 5.)

Healthpoint responds, first, that Derma Sciences "has not alleged it will

be unable to secure the attendance of any third-party witness at trial."  (Resp. at

13–14.)  It cites to <u>Ternium International U.S.A. Corp. v. Consolidated Systems,</u>

<u>Inc.</u>, in which the court held that the compulsory process factor is neutral where the

parties have not alleged that non-party witnesses are unwilling to testify.  Cv. No.

3:08-CV-0816-G, 2009 WL 464953, at *3 (N.D. Tex. Feb. 24, 2009).  Moreover,

Healthpoint points out that the parties can issue subpoenas to compel witnesses to

sit for depositions wherever they reside, are employed, or transact business.

(Resp. at 14 (citing Fed. R. Civ. P. 45(a)(2)(B)).  Healthpoint also argues that

Derma Sciences "has failed to . . . explain why any of [the graphic design]

agencies would have useful, let alone critical, information regarding this suit."

(Resp. at 10.)

Healthpoint is correct.  First, as Healthpoint notes, "[t]his is not a trademark or trade-dress case, and . . . graphic design is not at issue in this litigation."  (Id.)  To the extent that Derma Sciences' advertising materials are at issue, it is their <u>content</u> that is at issue—not any artistic/design choices that the graphic designers made.  Derma Sciences has given the Court no reason to think that the third-party vendors it mentions would be able to provide any relevant evidence that would not be discernible from the promotional materials themselves, which could be—and indeed have been—produced as exhibits.  (<u>See</u> Compl. Exs. ## 2–11.)

More importantly, while Derma Sciences has mentioned certain witnesses that live in and around New Jersey, it has not argued that compulsory process would be necessary to secure their presence at trial.  In the absence of such claims, this factor is neutral.  <u>See</u> <u>Kimberly-Clark</u>, Cv. No. 3:09-CV-0488-D, 2009 WL 2634860, at *5 (N.D. Tex. Aug. 26, 2009) ("[Defendant] has not identified any witnesses for whom compulsory process will be needed.  It admits that this factor is at best neutral."); <u>AllChem</u>, 2013 WL 180460, at *4 ("Because there is no evidence that either side requires compulsory process to obtain testimony in either venue, this factor is neutral.").  Again, while Derma Sciences claims to have witnesses in New Jersey, it has given the Court no reason to conclude that it would be more difficult to secure those witnesses' testimony in the Western District of

Texas than it would be to secure the testimony of Healthpoint's witnesses in the District of New Jersey; and a court should not transfer venue on convenience grounds when doing so "would merely shift the inconvenience to Plaintiff's witnesses." X Tech. v. Marvin Test Sys., Cv. No. SA:10-CV-319-XR, 2010 WL 2303371, at *6 (W.D. Tex. June 7, 2010).

    C.  Cost of Attendance for Willing Witnesses

        "Convenience for the witnesses has been recognized as 'the most important factor under § 1404(a).'" Bascom v. Maxim Integrated Prods., Inc., 534 F. Supp. 2d 700, 704 (W.D. Tex. 2008) (quoting Spiegelberg v. Collegiate Licensing Co., 402 F. Supp. 2d 786, 790 (S.D. Tex. 2005)); see also In re Genentech, Inc., 566 F.3d 1338, 1343 (Fed. Cir. 2009) (noting that convenience for the witnesses is the most important factor in an analysis under § 1404(a)). Additionally, "it is the convenience of non-party witnesses, rather than of party witnesses, that is more important and accorded greater weight in a transfer of venue analysis." Frito-Lay, 867 F. Supp. 2d at 870–71 (emphasis added); see also Bascom, 534 F. Supp. 2d at 704 (same); USPG Portfolio Two, LLC v. John Hancock Real Estate Fin., Inc., Cv. No. 3:10-CV-2466-D, 2011 WL 1103372, at *4 (N.D. Tex. Mar. 25, 2011) (declining to consider parties' employees under third factor).

Derma Sciences argues that "all of [its] relevant employee and third-party witnesses are located in the Northeast." (Mot. at 8.) Derma Sciences' corporate offices in the United States are located in Princeton, New Jersey, and the day-to-day operations relating to the sales, marketing, and clinical evaluation of its products are conducted there. (Mot. at 2.) "The witnesses most knowledgeable about these operations, including the preparation of the sales and marketing materials," work in New Jersey. (Mot. ¶ 4.) Derma Sciences lists seven individuals in particular: (1) Barry J. Wolfenson, Group President, Advanced Wound Care & Drug Development, who has knowledge and information concerning the sales and marketing of MEDIHONEY; (2) Beth J. Dougherty, Senior Marketing Manager, who has knowledge and information concerning the sales and marketing of MEDIHONEY; (3) Marcy Turkos, Clinical Field Manager, who has knowledge and information concerning the clinical evaluation of MEDIHONEY; (4) Maurice Donnelly, Vice President of Sales and Marketing, who has knowledge concerning the sales of MEDIHONEY; (5) Joe Sandoli, Vice President of Distributor Sales, who has knowledge concerning the sales of MEDIHONEY; (6) Ed Eisenlord, Vice President of Corporate Accounts, who has knowledge concerning the sales of MEDIHONEY; and (7) Bob Cole, Group President, Traditional Wound Care, Distribution and Corporate Accounts, who has knowledge concerning the sales of MEDIHONEY. (Mot. ¶ 4.) Derma Sciences

states that it has field sales staff for its products throughout the United States but that all of the Territory Sales Managers are overseen by Regional Managers who are in turn overseen by Maurice Donnelly (identified above), who works in New Jersey.  (Mot. ¶ 7.)  In other words, Derma Sciences suggests that the testimony of Mr. Donnelly, who oversees "customer interactions regarding Derma Sciences' products" (id.), will be more important than the testimony of individual field sales staff members.  Derma Sciences also lists as third-party witnesses four graphic design firms that prepared marketing materials for MEDIHONEY.  (Mot. ¶ 6.)

Healthpoint responds that, while New Jersey may be more convenient than Texas for some of Derma Sciences' employees, § 1404(a) requires courts to consider the impact on both parties, and a court should not transfer venue where it "'would merely shift the inconvenience to Plaintiff's witnesses.'"  (Resp. at 9 (quoting X Tech., 2010 WL 2303371, at *6).)  While some witnesses may be in New Jersey, there are also many key witnesses in this district.  First, Healthpoint is a Texas company, so "the vast majority of [its] employees, including key personnel who will be witnesses in this case, are in Texas."  (Resp. at 8.)  These employees include "[t]he product director and marketing director for SANTYL and the Healthpoint employees most knowledgeable about the clinical attributes of SANTYL, its sales and its regulatory status . . . ."  (Id.)  The distribution center for SANTYL is located in San Antonio, Texas, and the executives who oversee the

21

manufacturing of SANTYL's active ingredient and the distribution of SANTYL are employed by DPT Laboratories, which is headquartered in San Antonio. (Girolamo Decl. ¶ 8.)  In addition, as described in more detail above, Healthpoint has sponsored numerous clinical trials of SANTYL that were conducted in the Western District of Texas.  (Resp. at 9 (citing Girolamo Decl. ¶ 7).)

Finally, Healthpoint lists as potential witnesses (1) three sales representatives who promote SANTYL within the boundaries of the Western District of Texas and (2) a number of the healthcare centers they serve.  (Resp. at 8.)  These sales representatives are important witnesses, says Healthpoint, because they

> have heard from [Paramount Nursing Homes, Health South Rehab of Austin, and Saint David Wound Care Centers in Austin, Texas; and Brook Army Medical Command, in San Antonio, Texas] concerning representations by Derma Sciences' sales representatives that MEDIHONEY is "the same as SANTYL, works the same way, but costs less."

(Resp. at 8 (alteration in original) (quoting Girolamo Decl. ¶ 6).)  Because Healthpoint sales representatives have allegedly heard from these four medical institutions—all located in the Western District of Texas—that Derma Sciences has made misrepresentations about MEDIHONEY and SANTYL, employees of those institutions are also expected to be important witnesses.  (Resp. at 8.) Indeed, Healthpoint "is <u>most</u> interested in the testimony and documents from acute care centers, extended care facilities, wound and burn care clinics, hospitals,

nursing homes, home health agencies, group purchasing organizations, and managed care organizations . . . ."  (Resp. at 11 (emphasis added).)  "These are the customers," says Healthpoint, "[that] Derma Sciences solicited to purchase and use MEDIHONEY as an alternative to SANTYL and who will have key evidence regarding what Derma Sciences said, what impact these representations had, and how these representations diverted sales away from Healthpoint's SANTYL and towards MEDIHONEY."  (Resp. at 11.)

Derma Sciences responds that if Healthpoint's allegations are to be believed—i.e., if care centers around the country are being tricked into buying MEDIHONEY over SANTYL—Healthpoint's Texas-based witnesses will give testimony that is "not unique," and "equivalent testimony would be conveniently available in the District of New Jersey at no inconvenience to Healthpoint." (Reply at 8.)  The Court is unconvinced.  The fact that Healthpoint's allegations relate to Derma Sciences' national marketing of MEDIHONEY does not give Derma Sciences the right to dictate which witnesses Healthpoint must use to prove its case.  Healthpoint alleges that it already knows of specific instances in which employees of Derma Sciences misled customers at healthcare centers located in the Western District of Texas; it would, in fact, inconvenience Healthpoint to have to find new witnesses in and around New Jersey.  An analysis of this factor must

consider witnesses already identified or likely to be called, not witnesses the

moving party speculates may exist.

Once again, the Court finds that Derma Sciences has not shown that

this factor favors transfer.  First, with regard to the third-party witnesses Derma

Sciences mentions—the graphic designers—the Court, for the reasons already

given, finds that they are unlikely to provide testimony that is relevant to this case.

Moreover, to the extent that these witnesses may provide relevant evidence, Derma

Sciences has not suggested that such evidence could not be obtained through

videotaped depositions.  See, e.g., Symbol Tech., Inc. v. Metrologic Instruments,

Inc., 450 F. Supp. 2d 676, 679 (E.D. Tex. 2006) (finding that this factor did not

favor transfer where movant did not explain why certain third-party witnesses'

testimony would be necessary and where neither party was prevented from using

the videotaped depositions of unavailable witnesses at trial).

Second, while Derma Sciences has identified seven New Jersey-based

employees it alleges are knowledgeable about the clinical trials or marketing and

sales of MEDIHONEY (see Mot. ¶ 4), those individuals are party witnesses; and

"it is the convenience of non-party witnesses . . . that is more important and

accorded greater weight in a transfer of venue analysis."  Frito-Lay, 867 F. Supp.

2d at 870–71 (emphasis added); see also USPG Portfolio Two, 2011 WL 1103372,

at *4 (declining to consider parties' employees under third factor).  Moreover,

while certain high-ranking employees are in New Jersey, Derma Sciences'
marketing force is scattered across the country.  (Resp. at 9 (citing Compl. Ex. 10
(Derma Sciences' 2012 10-K) at 7).)  These are the employees, insists Healthpoint,
who have direct contact with potential customers and "who may well be critical
witnesses" regarding the alleged misrepresentations made by Derma Sciences in
the course of making sales to healthcare centers.  (Resp. at 9–10.)  To the extent
that these employees—who live across the United States—may be called as
witnesses, travel to the Western District of Texas is unlikely to be materially less
convenient than traveling to the District of New Jersey.  Indeed, because Texas is
located in the center of the country and not on a coast, it may actually be more
accessible to the Derma Sciences sales representatives flying in from other states.
Cf. Frito-Lay, 867 F. Supp. 2d at 870 (noting that a trial court should not consider
its "central location" under this prong unless—as here—some of the plaintiff's
witnesses reside in the plaintiff's chosen venue).  Accordingly, inconvenience to
the employees Derma Sciences lists does not weigh heavily in this analysis.

      Additionally, while Derma Sciences has identified some witnesses in
New Jersey, Healthpoint has identified many witnesses in the Western District of
Texas, including: (1) Healthpoint employees with knowledge of SANTYL and its
clinical trials, whose testimony is likely to be relevant to an inquiry into whether
Derma Sciences' alleged representations comparing MEDIHONEY to SANTYL

were actually false or misleading; (2) DPT Laboratories, which manufactures

SANTYL; (3) three sales representatives who know of healthcare centers that have

begun purchasing MEDIHONEY instead of SANTYL following allegedly false

representations by Derma Sciences; and (4) at least four healthcare centers whose

employees may be able to testify about the representations Derma Sciences made

to them and whether/why they began buying MEDIHONEY instead of SANTYL.

(See Resp. at 8–9; Girolamo Decl. ¶ 8.)  It is simply not clear why the Court should

favor the convenience of some of Derma Sciences' employees over the

convenience of Healthpoint's witnesses, especially when "the plaintiff is generally

entitled to choose the forum." Peteet v. Dow Chem. Co., 868 F.2d 1428, 1436 (5th

Cir. 1989).  Accordingly, this factor does not favor transfer.

    D.  All Other Practical Problems

       The parties have not raised any other practical problems.  Defendant

Derma Sciences has filed this Motion "early in the litigation, before any discovery

or litigation on the merits has taken place."  (Mot. at 8.)  Accordingly, this factor is

neutral.

III.  Public Factors

    A.  Administrative Difficulties Flowing from Court Congestion

       "Generally, this factor favors a district that can bring a case to trial

faster." Frito-Lay, 867 F. Supp. 2d at 871.  Recent statistics regarding the median

26

time to trial for civil cases in this district and the District of New Jersey suggest that this factor weighs against transfer.  According to the Administrative Office of the U.S. Courts, the median time to trial for civil cases in the Western District of Texas was 15.9 months and 17.8 months in 2011 and 2012 respectively, putting this district in the top ten percent of all federal judicial districts.  (Resp. at 15 (citing Grant Decl. Ex. 7 (Table T-3) and Ex. 8 (Case Load Charts).)  By contrast, during these same periods, the median time to trial in the district of New Jersey was 43.6 and 35.6 months, putting that district in the bottom third of all courts in 2012 and in last place in 2011.  (Id.)  On average, therefore, a transfer to the district of New Jersey would appear to double or even triple the time to trial.

Nevertheless, the Court is careful not to place undue weight on these statistics.  Court congestion is considered the "most speculative" of the factors, since "case-disposition statistics may not always tell the whole story."  Genentech, 566 F.3d at 1347.  Derma Sciences argued at the hearing that a small number of long-pending cases in New Jersey unfairly skewed the statistics. Additionally, the District of New Jersey has recently added two district judges, which will undoubtedly improve its statistics going forward.  However, this district, too, added a judge in 2013, so it is difficult to know with any certainty which of these two districts would bring this case to trial sooner.  Accordingly, taking into account

the many factors that may skew case-disposition statistics, the Court concludes that this factor is at best neutral and may even weigh against transfer.

    B. <u>Local Interest</u>

        The Court must also consider the local interest in the litigation, because "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." <u>Volkswagen I</u>, 371 F.3d at 206. "[T]he location of the alleged injury is an important consideration in determining how to weigh this factor." <u>Frito-Lay</u>, 867 F. Supp. 2d at 872 (citing <u>In re TS Tech USA Corp.</u>, 551 F.3d 1315, 1321 (Fed. Cir. 2008)). Derma Sciences argues that "[t]he District of New Jersey's interest in this matter is self-evident" because it "is home to the headquarters of Derma Sciences." (Mot. at 9.) By contrast, neither party has its headquarters in the Western District of Texas. (<u>Id.</u>) Moreover, Derma Sciences insists that there is no special connection to the Western District of Texas arising from the alleged injury because MEDIHONEY is sold nationwide. (<u>Id.</u>)

        The District of New Jersey, as home to Derma Sciences' headquarters, undoubtedly has an interest in this case. <u>See</u> <u>Geo Tag, Inc. v. Starbucks Corp.</u>, Cv. No. 2:10-CV-572, 2013 WL 890484, at *6 (E.D. Tex. Jan. 14, 2013) (noting that local interest "arises when a district is home to a party because the suit may call into question the reputation of individuals that work in the community") (citing

Hoffmann-La Roche, 587 F.3d at 1338).  However, the fact that Healthpoint does not have headquarters in the Western District of Texas does not automatically mean that this district has no interest in the litigation.  While Healthpoint's headquarters are in Fort Worth, SANTYL is manufactured in and distributed from San Antonio, Texas.  (Girolamo Decl. ¶ 8.)  The executives who oversee the manufacture and distribution of SANTYL are employed by DPT Laboratories, which is headquartered in San Antonio.  (Id.)  Accordingly, this district—which in a sense seems to be "SANTYL's" headquarters—has an interest in protecting Healthpoint and SANTYL from false advertising and unfair competition, which would hurt Healthpoint's and DPT's business.

Just as importantly, this district has an interest in this litigation because of the relevant events that allegedly took place here.  Derma Sciences is correct that in cases in which the injury is diffuse, such as in a patent infringement case where the accused product is sold nationwide, the alleged injury does not create a substantial local interest in any particular district.  Hoffmann-La Roche Inc., 587 F.3d at 1338 (citing TS Tech, 551 F.3d at 1321).  Unlike a patent infringement case, however, the instant case involves more than just the nationwide marketing of the accused product: Healthpoint alleges that it knows of specific "bad acts" that took place in this district.  See Hoffman-La Roche, 587 F.3d at 1338 ("[I]f there are significant connections between a particular venue and

29

the events that give rise to a suit, this factor should be weighed in that venue's favor.") (emphasis added) (citing Genentech, 566 F.3d at 1347, and Volkswagen II, 545 F.3d at 317–18).  Specifically, Healthpoint alleges that it initiated this suit after learning of at least four instances in which Derma Sciences made material misrepresentations to healthcare providers in the Western District of Texas.  (See Compl. ¶¶ 32–55.)  Healthpoint further alleges that Derma Sciences' misrepresentations caused those healthcare providers to purchase MEDIHONEY instead of SANTYL.  (See id.)  Derma Sciences also appears to have given a presentation making similar claims about MEDIHONEY at the Clinical Symposium on Advances in Skin & Wound Care in San Antonio, Texas, on October 22–25, 2009.  (See Grant Decl. Ex. 6.)  The fact that these incidents took place in the Western District of Texas weighs in favor of a finding that this district has an interest in this litigation.  See Hoffman-La Roche, 587 F.3d at 1338.  If Healthpoint's allegations are true—if MEDIHONEY is not a viable alternative to SANTYL—then the Western District of Texas has an interest in making sure that the healthcare centers within its borders are not deceived and that its citizens receive the proper treatment.  While Healthpoint undoubtedly expects to uncover evidence that employees of Derma Sciences made material misrepresentations to healthcare centers across the country, as of this moment its allegations are based in large part on misrepresentations allegedly made in this district, giving rise to a

local interest in this suit.  Accordingly, both because a number of "bad acts"

allegedly took place in this district and because this district has an interest in

Healthpoint's commercial success, the Western District of Texas has a local

interest in this litigation.  Because both forums have a local interest, however, the

Court concludes that this factor is neutral.

     C.  <u>Familiarity of the Forum with the Governing Law</u>

       Since the year 2000, Healthpoint has litigated in this district five false

advertising cases involving prescription pharmaceutical products: (1) <u>Healthpoint,</u>

<u>Ltd. v. Stratus Pharm., Inc.</u>, Cv. No. SA:00-CV-726-PM; (2) <u>Healthpoint, Ltd. v.</u>

<u>Ethex Corp.</u>, Cv. No. SA:00-CV-0757-OG; (3) <u>Healthpoint Ltd. and DPT Lab. v.</u>

<u>River's Edge Pharm., LLC</u>, Cv. No. SA:03-CV-0984-RF; (4) <u>Healthpoint Ltd. and</u>

<u>DPT Lab. v. Allan Pharm. LLC and Pharma Pac, LLC</u>, Cv. No. SA:07-CV-526-X;

and (5) <u>Healthpoint v. Medline Indus., Inc., and Acell, Inc.</u>, Cv. No.

SA:09-CV-00487-XR.  Some of these cases were, and remain, leading authority on

the application of § 43(A) of the Lanham Act in the pharmaceutical context.  <u>See,</u>

<u>e.g.</u>, <u>Healthpoint Ltd. v. Stratus Pharm., Inc.</u>, 273 F. Supp. 2d 769 (W.D. Tex.

2001).  Accordingly, this district is very familiar with the federal law that would

govern this case.

       Moreover, because Healthpoint also brings claims under Texas

common law for unfair competition, a Texas federal court would be better

equipped than a New Jersey court to apply that law.  See Time, Inc. v. Manning,
366 F.2d 690, 698 (5th Cir. 1966) (noting that a district court in Louisiana would
be better equipped to apply Louisiana law than a New York district court); Bianco
v. Globus Med., Inc., Cv. No. 2:12-CV-147-JRG, 2012 WL 5610371, at *6 (E.D.
Tex. Nov. 15, 2012) (finding that this factor weighed against transfer because,
"[w]hile this Court is confident in any United States District Judge's ability to
fairly and correctly apply Texas law, this Court is more familiar with the Texas
state law claims than the courts of [the Eastern District of Pennsylvania]").
Accordingly, this public-interest factor weighs against transfer.

     D.  Avoidance of Unnecessary Problems of Conflict of Laws

     Neither party raises any issue regarding the conflict of laws, and the
Court is aware of none; this factor is neutral.

*       *       *

     As detailed above, all of the private- and public-interest factors in this
case are either neutral or weigh against transfer.  It is the moving party's burden to
"clearly demonstrate that a transfer is '[f]or the convenience of parties and
witnesses, in the interest of justice.'" Volkswagen II, 545 F.3d at 314 (quoting 28
U.S.C. § 1404(a)).  Because Derma Sciences has not met this burden, its Motion is
denied.  See id. at 315 ("[W]hen the transferee venue is not clearly more

convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected.").

## CONCLUSION

For the reasons given, the Court **DENIES** Defendant's Motion for Transfer of Venue to the District of New Jersey (doc. # 15).

**IT IS SO ORDERED.**

**DATED:** April 9, 2013.

_____
David Alan Ezra
Senior United States District Judge